# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal File No. 19-CR-304 (SRN/TNL) |
| Plaintiff, | |
| v. | ORDER |
| Brandon Richard Blegen, | |
| Defendant. | |

Thomas M. Hollenhorst, U.S. Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for the Government

Frederick J. Goetz, Goetz & Eckland PA, 615 1st Ave. NE, Ste. 425, Minneapolis, MN, 55413 for Defendant Brandon Richard Blegen

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Brandon Richard Blegen's Motion for Reconsideration of Order of Detention [Doc. No. 78]. Based on a review of the file, record, and proceedings herein, and for the following reasons, the Court denies the motion.

## I. BACKGROUND

### A. Procedural and Factual Background

On December 30, 2019, the Court ordered Blegen to be detained during the pendency of the case, pursuant to 18 U.S.C. § 3142(e)(3). (*See* Order of Detention [Doc. No. 48].) The magistrate judge held that "[b]ecause the defendant is charged with an offense under the Controlled Substances Act which carries a maximum term of imprisonment of 10 years or more, this creates a rebuttable presumption that no condition or combination of

conditions will reasonably ensure the defendant's appearance in court and the safety of the community." (*Id.* at 2.) After considering this presumption, the charges in the Indictment, the factors under 18 U.S.C. § 3142(g), and the arguments of counsel, the magistrate judge found, by a preponderance of the evidence, that no condition or combination of conditions could reasonably assure Defendant's future court appearances; and by clear and convincing evidence, no condition or combination of conditions would reasonably assure the safety of the community if Defendant were released pending trial. (*Id.*)

On February 27, 2020, Blegen pleaded guilty to one count of conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(l)(A) and 846. (Feb. 27, 2020 Court Minutes [Doc. No. 71]; Plea Agmt. [Doc. No. 72].) Given his criminal history, Blegen faces a maximum penalty of up to life imprisonment. (*See* Plea Agmt. ¶¶ 4–5.)

Following the hearing on Blegen's change of plea, the Court remanded him to the custody of the U.S. Marshals. (Feb. 27, 2020 Court Minutes.) He is currently held in detention at the Sherburne County Jail ("the Jail") awaiting sentencing.

### B. Parties' Arguments and Evidence

Given the COVID-19 pandemic, Blegen now seeks release, pending sentencing, to his parent's house in Ham Lake, Minnesota, subject to GPS monitoring and refraining from the use of drugs and alcohol. (Def.'s Mot. at 1.) He argues that the COVID-19 pandemic poses a threat to public health and safety within jails, including his own health and safety, and is an exceptional circumstance warranting release pending sentencing. (*Id.* at 2–5.) Blegen asserts the following in support of his argument: (1) that conditions of pretrial confinement "create

the ideal environment for the transmission of contagious disease"; (2) "inmates cycle in and out of the jail"; (3) people who work in the facility "leave and return daily, without screening"; and (4) "[i]ncarcerated people have poorer health than the general population." (*Id.* at 3.) And, while Blegen concedes that Jail administrators have taken "the extreme but necessary measure of preventing all in-person attorney-client visits, effective March 14, 2020," and have otherwise "made efforts" to provide detainees access to their attorneys, such measures are "inadequate for providing a reasonable opportunity to work with counsel to prepare a defense," as they are lacking in privacy. (*Id.* at 5.)

The Government opposes Blegen's motion. It argues that the jail has implemented effective measures to prevent and mitigate against the risk of COVID-19 to inmates, and while the virus is dangerous, it does not warrant the release of Defendant, who has been found to pose a risk of flight and a danger to the community. (Gov't's Opp'n [Doc. No. 83] at 3–8.) In addition, the Government asserts that the risk created by the pandemic is not unique to Blegen, and is not an exceptional reason under the law to warrant his release. (*Id.* at 8–11.) Finally, the Government argues that the release of pretrial detainees like Defendant would unduly burden Probation and Pretrial Services officers and the justice system, which face numerous other challenges related to the COVID-10 pandemic (*Id.* at 11–12.)

In response to Defendant's concerns about COVID-19 and the safety of conditions in the Jail, the Government submits the Affidavit of Brian Frank (the "Frank Aff." [Doc. No. 83-1]). Mr. Frank is the Jail Administrator of the Sherburne County Jail, and supervises the operations of the facility. In his affidavit, Frank details the general background, structural safety, operational safety, and medical safety of the Jail, as well as the efforts taken to facilitate

3

detainees' ability to consult with counsel.[1] Frank notes that at present, there are no known cases of COVID-19 in the Jail. (Frank Aff. ¶ 3.) In light of the pandemic, the Jail has "proactively modified its already stringent safety and cleaning measures," by placing new inmates in a 14-day quarantine that is isolated from the general population and monitored by licensed medical professionals. (*Id.*) Any inmates reporting illness are seen by a licensed medical provider who performs a general medical assessment and administers a Coronavirus Screening Checklist. (*Id.,* Ex. 1 (Coronavirus Checklist).) Frank states that if an inmate presents confirmed symptoms of illness, staff will place the inmate into medical isolation. (Frank Aff. ¶ 3.) Moreover, the Jail has reduced its staffing to only "essential employees," who are screened daily, including a body-temperature check, prior to entering the facility. (*Id.*)

In terms of the Jail's structural safety, Frank states that it is designed to contain an airborne threat and prevent it from spreading throughout the facility. (*Id.* ¶ 6.) If necessary, the Jail can isolate into 12 distinct sectors or "smoke zones." (*Id.*) To do so, the Jail's nine separate air exchange units can be calibrated to bring in a certain percentage of fresh air, while

---

[1] As a general matter, Frank notes that the Sherburne County Jail is accredited by the American Correctional Association and is one of only two jails in Minnesota to earn this distinction. (Id. ¶ 4.) The Jail earned a 97.3% rating on its most recent inspection by the American Correctional Association, and received a 100% rating during its last inspection by the Minnesota Department of Corrections. (Id.)

Frank also states that the Jail provides licensed or certified medical care for inmates through a nurse practitioner, nursing director, nine registered nurses, 14 health technicians, and a team of mental health professionals. (Id. ¶ 5.) In addition, the Jail contracts with an independent medical doctor and a licensed mental health clinical counselor to peer review the Jail's medical operations and review charts for patient care. (Id.) If inmates have greater medical needs, the Jail provides outside clinical or hospital care. (Id.)

exhausting the same amount of air from inside the Jail. (*Id.*) The return air passes through a MERV-8 filter before entering the Jail. (*Id.*) Within a given zone, this ventilation system is able to recycle up to 100% of the air with fresh air. (*Id.*) The Jail can control the percentage variable, which is typically set at approximately 20%. (*Id.*) In light of COVID-19 safety measures, the Jail has adjusted the value for all zones to 80%. (*Id.*) Because of the Jail's understanding that the virus is transmitted primarily through water particles, it believes that "this ventilation system is imperative to minimizing potential exposure within the Jail community." (*Id.*) The Jail monitors the ventilation settings in all zones and will adjust them as necessary. (*Id.*)

Frank observes that the Jail has 24 units designated to quarantine new arrivals to the facility. (*Id.* ¶ 7.) New inmates are housed in these dedicated units for 14 days. (*Id.*) During this period of isolation, licensed medical providers monitor and screen the new inmates for any signs or symptoms of illness. (*Id.*) If an inmate displays such signs of illness, licensed medical providers examine and treat the inmate accordingly. (*Id.*)

In addition, Frank states that the Jail has a separate space for inmates who are diagnosed with an illness by a medical professional, and the space is separate from the quarantine units for new arrivals. (*Id.* ¶ 8.) Only after a medical professional deems it safe for the inmate to return to the general population does an inmate return. (*Id.*)

Frank further states that the Jail has contingency plans in the event that COVID-19 is present in the Jail. (*Id.* ¶ 9.) Under this plan to isolate and control any such outbreak, the Jail will designate entire areas for isolated housing, or establish a special housing unit for inmates who test positive for the virus. (*Id.*) The Jail also has three negative-pressure

units in which it could treat severely symptomatic inmates. (*Id.*) Such units are mechanically ventilated to generate negative pressure and prevent contaminated air from escaping. (*Id.*)

As to the Jail's operational safety, Frank states that staff constantly monitor the COVID-19 pandemic and modify procedures accordingly. (*Id.* ¶ 10.) The Jail reviews daily updates from the Center for Disease Control and Prevention ("CDC") and implements guidance specifically tailored to a correctional facility environment. (*Id.*) In addition, three days a week, the Jail participates in a teleconference with the Minnesota Department of Corrections to discuss COVID-19 and best practices to ensure inmate safety. (*Id.*) Frank also asserts that the Jail "maintains rigorous and routine cleaning, sanitation, and hygiene procedures." (*Id.* ¶ 11.) The Jail cleans all frequently-touched surfaces in housing units four times daily with a virus-killing chemical, and additionally cleans housing units before every meal and the nightly lockdown. (*Id.*) Hallways are cleaned and disinfected three times daily and floors are cleaned once a day. (*Id.*) Further, the Jail ordered 250 gallons of sanitizing cleaner that it expected to receive by March 27. (*Id.*) Finally, Jail staff have shared CDC guidance on proper handwashing techniques and social distancing with inmates. (*Id.* ¶ 12.) Jail staff monitor and enforce this guidance as necessary. (*Id.*)

Frank also asserts that medical staff facilitate and monitor the 14-day quarantine of new arrivals at the Jail. (*Id.* ¶ 14.) Staff administer the Coronavirus Screening Checklist and continue to monitor new arrivals throughout the 14-day quarantine period, including by monitoring body temperature on a daily basis. (*Id.*) Only after a new arrival completes the 14-day quarantine is he or she allowed to enter the general population. (*Id.*) The Jail's

medical staff likewise monitor any inmates in the general population who complain of illness or exhibit symptoms. (*Id.* ¶ 15.) Staff administer the Coronavirus Screening Checklist, complete medical assessments, and provide any necessary care. (*Id.*) Care may include a protective surgical mask, routine care, or placement in isolation. (*Id.*)

As to the Jail's staffing complement, Frank states that currently, only essential employees are working at the facility in order to limit the potential exposure to illness within the Jail. (*Id.* ¶ 16.) Supervisory staff actively monitor essential staff members, who are screened every time they enter the Jail with a body-temperature check and the Coronavirus Screening Checklist. (*Id.*) If an employee shows any symptoms of illness, the employee is denied admission onto the premises. (*Id.*)

Finally, regarding the ability of inmates to consult with defense counsel, Frank states that while concerns about COVID-19 have caused the Jail to temporarily discontinue contact visits, inmates retain the ability to consult with defense counsel. (*Id.* ¶ 17.) All inmates and counsel may use video visitation in the common areas of the housing unit, which is neither recorded nor expressly monitored. (*Id.* ¶ 18.) In limited circumstances, the Jail may be able to accommodate a request for greater privacy, but hopes that such accommodations are unnecessary, in light of other opportunities for interactions between inmates and defense counsel. (*Id.*) With prior Court approval, the Jail also facilitates video teleconferencing for inmates to appear for court appearances. (*Id.* ¶ 19.) The Jail also is committed to facilitating interactions between inmates and defense counsel before, during, and after court appearances. (*Id.*)

## II. DISCUSSION

In the absence of "exceptional reasons" under 18 U.S.C. § 3145(c), the Court is required to order the detention of a defendant convicted of an offense in violation of the Controlled Substances Act "for which a maximum term of imprisonment of ten years or more is prescribed," 18 U.S.C. § 3142(f)(1)(C), and who is awaiting sentencing unless:

> (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
>
> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2); *United States v. Schmitt*, 515 Fed. App'x. 646, 646–47 (8th Cir. 2013).

As a defendant who has pleaded guilty to an offense under the Controlled Substances Act, for which the maximum term of imprisonment exceeds ten years, the requirements for release under § 3143(a) apply to Blegen. However, he does not meet them. No motion for acquittal is pending, nor is the Government advocating against a sentence of imprisonment. (*See* Gov't's Opp'n at 7.) Moreover, the magistrate judge has determined, by clear and convincing evidence, that no condition or combination of conditions would reasonably assure the safety of the community if Defendant were released pending trial. (Order of Detention at 2.) This leaves the question of whether the COVID-19 pandemic presents an "exceptional reason" making Blegen's continued detention inappropriate under 18 U.S.C. § 3145(c). Under this provision, a defendant may be ordered released "if it is clearly shown that there

are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c).

The Court appreciates Blegen's concerns, as well as the challenges faced by detention facilities during this time. However, the Court finds that, at present, the COVID-19 outbreak does not constitute an exceptional reason that renders Blegen's continued detention inappropriate under 18 U.S.C. § 3145(c).

First, the Court does not doubt the genuineness of Blegen's concerns for his health and safety. However, his concerns are too generalized and speculative in nature, as he simply states, (Def.'s Mot. at 3), the conditions of confinement "create the ideal environment for the transmission of contagious disease," "inmates cycle in and out of the jail," and "[i]ncarcerated people have poorer health than the general population."[2] *See United States v. Winchester*, No. 18-cr-301(1), 2020 WL 1515683, at *5 (M.D.N.C. Mar. 30, 2020) (denying request for release in wake of COVID-19 pandemic, and finding that the defendant failed to address the circumstances at the facility in which he was detained, and instead extrapolated "from far-flung situations in the broadest of broad-brush strokes[.]").

In opposition to Blegen's generalized concerns, in the Frank Affidavit, the Jail has provided detailed information about the significant steps it has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety. As noted, the Jail quarantines and monitors incoming detainees for a 14-day period, and provides screening and

---

[2] Given this evolving situation, this is not surprising. As Mr. Frank observes in his Affidavit, he is unaware of any conversations between defense counsel and the Jail that have fully detailed the Jail's ability to address the situation. (Frank Aff. ¶ 21.)

medical care to any current inmates who exhibit signs or symptoms of illness. Moreover, despite Defendant's speculation that Jail staff "leave and return daily, without screening," the Jail is operating with only essential staff, who are screened and monitored for COVID-19 daily. As of this writing, those steps appear to be successful, as there have been no reported incidents of COVID-19 within the Sherburne County Jail. *See United States v. Morris*, No. 17-cr-107(01) (DWF/TNL), 2020 WL 1471683, at *4 (D. Minn. Mar. 26, 2020) (noting, as of March 26, 2020, "zero reported cases of COVID-19 in the jail."); *see also United States v. Hamilton*, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (stating, "perhaps most importantly, as of this writing, there have been no reported incidents of COVID-19 within [defendant's detention facility], and the Bureau of Prisons is taking system-wide precautions to mitigate the possibility of infection within its facilities. As such, given the risks that [defendant's] release would pose, the court concludes that the possibility of an outbreak at [his detention facility] is not a 'compelling circumstance' justifying his release."). In addition, the physical structure and airflow arrangements of the Jail are designed to protect inmates, and have been enhanced to provide even greater measures of protection.

Second, Blegen does not represent that he has a medical condition that places him at greater risk with respect to COVID-19 than the rest of the population. *See United States v. Sanders,* No. 19-20037-01-DDC, 2020 WL 1528621, at *4 (D. Kan. Mar. 31, 2020) (noting that the defendant has no elevated personal risk factors for COVID-19, and may actually be at greater risk outside the prison). The risk created by the pandemic is not unique to Defendant, and exists in society at large. *See, e.g., United States v. Kerr*, No. 18-cr-296-L, 2020 WL 1529180, at *3 (N.D. Tex. Mar. 31, 2020) (stating that fear of COVID-19 outbreak

is not unique to the defendant in particular, and is not an "exceptional circumstance."); *United States v. Cornish*, No. 20-cr-3-GFVT-MAS, ___ F. Supp. 3d ___, 2020 WL 1498841, at *5 (E.D. Ky. Mar. 30, 2020) (finding that because COVID-19 is prevalent in the community at large, any difference in health risks to detained population was minimal); *United States v. Jackson*, No. 18-cr-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (finding it speculative to presume that COVID-19 was present or imminent in jail, and noting that potential exposure exists anywhere in the wider community).

In sum, Defendant's medical and health related concerns concerning COVID-19 do not constitute an "exceptional reason" under § 3145(c) to justify his release from the Sherburne County Jail. *See Morris*, 2020 WL 1471683, at *4 (finding, as to a defendant housed in the Sherburne County Jail who cited age and poor health, that COVID-19 pandemic did not constitute an exceptional reason for release); *United States v. Quijada*, No. 19-cr-276 (DSD/TNL), (D. Minn. Mar. 20, 2020 [Doc. No. 32]) (finding COVID-19 pandemic was not an exceptional reason warranting release from Sherburne County Jail).

Finally, as to Blegen's concerns about obtaining meaningful access to counsel to prepare a defense, the Court finds that the measures in place at the Jail are sufficient. (*See* Frank Aff. ¶¶ 17–19.) The current measures for consulting with counsel do not present an exceptional reason warranting Defendant's release.

## III. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Reconsideration of Order of Detention [Doc. No. 78] is **DENIED**.

Dated: April 2, 2020                          s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge