UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>BRANDON RICHARD BLEGEN,<br><br>    Defendant. | Case No. 19-CR-0304(1) (SRN/TNL)<br><br>**DEFENDANT'S POSITION<br>PLEADING AS TO SENTENCE** |

## I.    INTRODUCTION

Brandon Richard Blegen is a 36-year-old man who has struggled with drug addiction for over 20 years. Since he was 17 years old, Mr. Blegen has been addicted to methamphetamine. Prior to his arrest for the instant offense, Mr. Blegen's methamphetamine use got so bad that he was injecting 5 to 6 grams of the drug every day. Mr. Blegen's long history of drug abuse destroyed many aspects of his life including his ability to hold a steady job. To support himself, he turned to drug dealing; a choice that brings him before this Court.

On July 16, 2020, defendant will appear before the Court for sentencing having pleaded guilty to conspiracy to distribute 500 grams or more of methamphetamine. Because he has a prior conviction for a crime of violence and the Government chose to file an information under 21 U.S.C. §851, Mr.

Blegen is subject to a 15-year mandatory minimum sentence. Depending on how the Court resolves disputed sentencing factors, Blegen is subject to an advisory Guideline's imprisonment range of up to 324 months to 405 months. Whatever the Guideline's range, Mr. Blegen asks that the Court sentence him to a term of imprisonment of no more than 180 months. Such a lengthy prison sentence is sufficient but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. §3553(a). In particular, the defendant's individual circumstances, including his long history of drug abuse and the "hard time" he has already served while awaiting sentencing, warrant a downward variance from the advisory Guideline's range.

## II. OBJECTIONS TO PRESENTCE INVESTGATION REPORT

Defendant maintains the following objections to and request for modification of the Presentence Investigation Report (PSI). (Dkt. 96).

F.2. Defendant would amend the information at "Education:" to reflect that he graduated from Blaine High School in 2001 and that this is verified. See PSI ¶74.

F.2. Defendant would amend the "aliases" to strike the name of Brandon Mitchell Blegan. Mr. Blegen has never used this name. He knows nothing about it nor where it came from. It has nothing to do with him and should be stricken from the PSI.

¶21. Defendant objects to any enhancement under U.S.S.G. §2D1.1(b)(12). Defendant did not maintain the hotel room rented by co-defendant Meyers. Upon information and belief, Meyers rented the hotel room at issue mere hours before it was searched by law enforcement. Because Mr. Blegen did not maintain the hotel room, the enhancement does not apply.

¶26. In light of defendant's objection to ¶21, he would amend this paragraph to reflect an adjusted offense level of 38.

¶30. In light of defendant's objection to ¶21, defendant would amend this paragraph to reflect a total offense level of 35.

¶46. Defendant objects to the factual narrative in this paragraph and disputes the version of the incident given by P.T. Contrary to P.T.'s claims, the defendant was standing with a group of people when P.T. came up to the group and started being belligerent and swearing at a female. Defendant told P.T. to leave the female alone. P.T. went after the defendant at which point the female intervened. P.T. grabbed the female by the throat and shoved her out of the way. P.T. then swung at the defendant. The defendant struck P.T. in defense. The defendant never struck P.T. with a glass bottle. In fact, the area where the defendant and P.T. were does not allow glass bottles as it is an outside patio area.

¶53. Defendant notes that he expects the related prosecution in Hennepin County District Court to be dismissed immediately after sentencing in the

3

instant case. When that happens, he asks that the information in this paragraph be changed to reflect that there is <u>no</u> active warrant in relation to this case.

¶84. Defendant would amend this paragraph to reflect that he never had an American Express credit card. This is not the defendant's account and any reference to this account should not be included in the PSI. If this information appears in a credit report, it is the error of the credit agency and should not be included in the PSI.

¶87. Given defendant's objection to ¶21, with a total offense level of 35 and a criminal history category of V, the advisory Guidelines' range is 262 to 327 months imprisonment.

## III.    ARGUMENT

### A.    *Sentencing Considerations Generally*

In *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), the United States Supreme Court clarified the two-step process to be followed in federal sentencing.  The first step is to determine the proper Guidelines range for the defendant's sentence. *Gall,* 552 U.S. at 49, 128 S.Ct. at 596.  In the second step, the court should consider the factors in 18 U.S.C. §3553(a) and determine whether a departure or a variance is appropriate. *Gall,* 552 U.S. at 49-50, 128 S.Ct. at 596-97; *United States v. Roberson,* 517 F. 3d 990, 993 (8th Cir., 2008).

The correct calculation of a sentence under the guidelines is a starting point. *Gall,* 552 U.S. at 49, 128 S.Ct. at 596. The overarching consideration under the Sentencing Reform Act is that the sentencing court "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States,* 552 U.S. 85, 101, 128 S.Ct. 558, 570 (2007). As the United States Supreme Court recognized, "(i)t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 2053 (1996). Indeed, the district courts have an "institutional advantage" in making sentencing decisions as "they see so many more Guidelines cases than appellate courts do." *Koon*, 518 U.S. at 98, 116 S. Ct. at 2047.

18 U.S.C. §3661 governs the use of information for sentencing. This statute provides that "(n)o limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661. By enacting this statute, "Congress codified the 'long standing principle that sentencing courts have broad discretion to consider various kinds of information." *Pepper v. United*

5

*States,* 562 U.S. 476, 488, 131 S.Ct. 1224, 179 L.Ed.2d 166 (2011); *United States Watts,* 519 U.S. 148, 151, 117 S.Ct. 663, 136 L.Ed.2d 554 (1997).  The United States Supreme Court has emphasized that possession of the fullest information possible concerning a defendant's life and characteristics is "highly relevant—if not essential—to the selection of an appropriate sentence." *Pepper,* 562 U.S. at 488; citing *Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper,* 562 U.S. at 488; citing *Wasman v. United States,* 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

The traditional discretion of sentencing courts to conduct a broad inquiry that includes largely unlimited information continued after passage of the Sentencing Reform Act of 1984 and the enactment of the United States Sentencing Guidelines scheme.  *Pepper,* 562 U.S. at 488-489.  Under the Supreme Court's existing sentencing framework, while the Guidelines are the starting point for sentencing and an initial benchmark, "district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in §3553(a), subject to appellate review for 'reasonableness.'"  *Pepper,* 562 U.S. at 490; citing *Gall,* 552 U.S. at 49-51.

B.     *The Guidelines Calculation.*

No enhancement is warranted for maintaining a stash house as Blegen did

not "maintain" a hotel room that on a single occasion had only been rented

for a matter of hours.

The PSI concludes that a two-level offense level increase is warranted

under U.S.S.G. §2D1.1(b)(12) as "(i)nvestigative materials reveal upon

directive from Blegen, codefendant Meyers rented a hotel room to be used by

Blegen and other participants of the conspiracy to store and access a known

amount of methamphetamine for further trafficking within Minnesota." PSI

¶21. Defendant objects to the application of this enhancement on the grounds

that he did not "maintain" the hotel room where the room had only been

rented for a matter of hours and any use of the hotel room to store narcotics

was brief and transient. The Government bears the burden of proving all

sentencing enhancements by a preponderance of the evidence. *United States*

*v. Flores,* 362 F.3d 1030, 1037 (8th Cir. 2004).

§2D1.1(b)(12) of the Guidelines provides for a two-level offense level

increase "if the defendant maintained a premises for the purpose of

manufacturing or distributing a controlled substance."  Note 17 of the

Commentary to §2D1.1 more fully explains this enhancement stating in

pertinent part as follows:

7

Subsection (b)(12) applies to a defendant who knowingly maintains a premises…for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purposes of distribution.

Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. §2D1.1, Commentary, Application Note 17 (2018).

The "stash house" or "crack house" sentencing enhancement was enacted after Congress, in the Fair Sentencing Act of 2010, "directed the Sentencing Commission to add a two-level enhancement if 'the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in section 416 of the Controlled Substances Act (21 U.S.C. 856).'" *United States v. Miller,* 698 F.3d 699, 705 (8th Cir. 2012); citing Pub. L. No. 111-220,§6(2), 124 Stat. 2372, 2373 (2010). §856(a)(1) provides in pertinent part that it is unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of

manufacturing, distributing, or using any controlled substance." 21 U.S.C. §
856(a)(1) (2019). Unlike the statute, however, the enhancement only applies
to a defendant who knowingly "maintains" a premises. U.S.S.G.
§2D1.1(b)(12).

The Eighth Circuit noted in *Miller* that prior to 2003, §856(a)(1) provided
that it was unlawful to "knowingly open or maintain any place for the
purpose of manufacturing, distributing, or using any controlled substance."
*Miller,* 698 F.3d at 705, n. 2. Congress could certainly have directed that a 2-
level increase also apply for those who "open, lease, rent" or "use" a premises
but chose not to. The fact that the Guidelines have not been amended to
adopt the language of the post-2003 version of the crack house statute
suggests strongly that "maintains" for purposes §2D1.1(b)(12) requires proof
of something more than opening, leasing, renting or using a premises.

Cases interpreting §2D1.1(b)(12) support this interpretation. In *United
States v. Morales-Ortuno,* 879 F.Supp.2d 608 (E.D. Tex. 2012); the district
court concluded that application of the stash house enhancement was not
appropriate where the defendant controlled the premises, an apartment, for
less than a week and, though a large quantity of cocaine was found there, no
other drug activity was observed at the premises during the time the
defendant controlled it. Id. at 610. The *Morales-Ortuno* court looked to two
circuit court opinions interpreting §856 both of which stand for the

proposition that to "maintain" a premises requires proof of owning, renting or exercising control for a sustained period of time. Id at 609-610; citing *United States v. Morgan,* 117 F.3d 849, 857 (5th Cir. 1997) ("'Maintain' connotes a degree of continuity and duration that is not an attribute of possession'"); *United States v. Acosta,* 534 F.3d 574, 591 (7th Cir. 2008) (finding that an individual "maintains" a premises if he owns, rents or controls the premises for a sustained period of time).

In *Miller,* the Eighth Circuit concluded that the "stash house" enhancement applies "when a defendant uses the premises for the purposes of substantial drug trafficking activities, even if the premises was also her family home at the times in question." Id. Evidence of "substantial drug trafficking activities" in *Miller* included four controlled buys from the Miller residence as well as other sales of methamphetamine occurring at the premises. Id at pp. 702-703. Additional evidence supporting application of the enhancement included that Mr. Miller, who resided at the premises, admitted distributing massive quantities of methamphetamine over the course of six years and telling his drug customers they would find methamphetamine in various locations around the premises as well as evidence that he kept records related to his drug distribution activities at his home. Id at 706.

In *United States v. Flores-Olague,* 717 F.3d 526 (7th Cir. 2013); the Seventh Circuit found the Eighth Circuit's decision in *Miller* informative and persuasive

10

in determining when the "stash house" enhancement of §2D1.1(b)(12) applies. In determining whether a family home could also be a "stash house," the Seventh Circuit considered both the frequency and significance of the illicit activities conducted on the premises. *Flores-Olague,* 717 F.3d at 533-534. Evidence supporting the application of the "stash house" enhancement in *Flores-Olague* included that the defendant sold and stored drugs at his home "on a daily basis" over a three-year period. Id at 533. Additionally, in a search of the home law enforcement recovered $53,620.00 in United States currency, four firearms, five cellular phones, and other paraphernalia. Id at 534.

Other cases finding that the enhancement applies have also involved substantial drug trafficking activity at the premises as opposed to a one-off occurrence. In *United States v. Garcia,* 774 F.3d 472 (8th Cir. 2014); the Eighth Circuit found that the enhancement applied based on evidence that the defendant regularly used a detached garage on the premises to store vehicles that were used in a drug conspiracy and that these vehicles sometimes contained large quantities of drugs when they were stored in the garage. *Garcia,* 774 F.3d at 475. Similarly, in *United States v. Sykes,* 854 F.3d 457 (8th Cir. 2017); the "stash house" enhancement applied based on evidence of four controlled buys occurring at the residence over a period of a month as well as the seizure of packing materials, $748.00 in cash, a nylon gun case, a

measuring cup and a razorblade with cocaine residue being found at the time of the search. *Sykes,* 854 F.3d at 461-462.

As in *Morales-Ortuno*, and consistent with the above authority, Blegen did not "maintain" a hotel room that was only rented for a few hours, not a sustained period of time. During the few hours that the hotel room was rented by Meyers, there are no reports of any drug sales occurring in or out of that hotel room. Even accepting that Blegen controlled the hotel room because he asked Meyers to get it for him, other than the fact that a large amount of drugs was found in the hotel room, no other drug activity was observed at the hotel room during this period of time.

To apply the §2D1.1(b)(12) enhancement to the facts of this case would be contrary to the clear Congressional intent that something more than simply using a premises is required for the stash house enhancement to apply. If the enhancement is applied here, then the enhancement is applicable to virtually any case involving a distribution quantity of drugs found in any building or structure no matter how briefly such premises were controlled by a defendant. Such a broad application is contrary to the established case law which interprets to "maintain" as requiring some ongoing activity occurring over a sustained period of time.

The Government may argue that because Blegen had drugs with him when he stayed at other hotel rooms, that this meets the definition of "to

maintain." However, such argument, if raised, ignores that §2D1.1(b)(12) is limited to "a premises." Id. (Emphasis supplied). The Guideline provision does not provide for enhancement for using "premises" in general but applies if "a premises" was used for the purpose of manufacturing or distributing a controlled substance. §2D1.1(b)(12). Indeed, the language in the Commentary to §2D1.1 repeatedly refers to "the premises," showing that assessing whether a defendant maintained a premises and the purpose for which a premises was maintained is a premises specific inquiry. If §2D1.1(b)(12) was meant to apply to a pattern of conduct involving multiple premises, then the words "a" and "the" would not precede "premises" in both the Guideline provision and the Commentary. Because the analysis must focus on a specific premises and because here, this specific premises, the hotel room at the Country Inn and Suites, was only rented for a matter of hours; the Government cannot show that the stash house enhancement applies.

C.    *Sentencing considerations of 18 U.S.C. §3553(a) warrant a total sentence of no more than 180 months imprisonment.*

   *United States v. Booker,* 534 U.S. 220, 261-262, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005) (Breyer, J.), mandates that sentences be "reasonable" in light of the factors enunciated in 18 U.S.C. §3553(a); *United States v. Winters,* 416 F.3d 856, 859 (8th Cir. 2005). These factors include the following:

13

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for-

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

14

(6) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar

conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a).

As *Booker* made the United States Sentencing Guidelines advisory, the

Court has the discretion to apply the sentencing objectives and factors

outlined above and impose a sentence not previously authorized under the

Guidelines. *United States v. Robinson,* 409 F.3d 979, 981–82 (8th Cir. 2005).

a.  <u>The nature and circumstances of the offense and the history and</u>
    <u>characteristics of the defendant.</u>

Mr. Blegen understands and fully accepts that his offense conduct

warrants a lengthy prison sentence. He knows full well the harm he was

inflicting upon his community by distributing large amounts of

methamphetamine. He knows how methamphetamine can take over someone's

life, rip them apart from their families, take away meaningful opportunities of

work, and turn their entire existence into a blind pursuit to get high again and

obtain whatever financial resources are required to do it. Mr. Blegen knows

this because this is what happened to him.

Distributing 45 kilograms or more of a mixture containing

methamphetamine is absolutely very serious. In mitigation, however, despite

the fact that this case involves a large amount of drugs, many of the tools of the drug trade are not present here. Most significantly, Mr. Blegen did not use or possess any firearms during the course of committing this offense. Additionally, there is no evidence that he used violence at all in the course of this crime.

Brandon Blegen comes from a good family and no doubt had opportunities in life. However, beginning when he was a teenager, he developed a serious illness—chemical dependency—which altered the course of his entire life. Though he had job opportunities available to him, he could not keep a job because he was gripped by drug addiction. Prior to his arrest he was an intravenous methamphetamine user who would inject 5 to 6 grams of the drug into his arms every day. (PSI ¶68-69).

Despite all of his troubles and challenges, Mr. Blegen still has the support of his family and friends. (PSI ¶55, 57). Mr. Blegen will file separately letters of support from the following friends and family members:

- Alexis Benson, friend;
- Andrew Moran Lee, friend;
- Barb Blegen, mother;
- Brad Blegen, father;
- Crystal Bauer, family friend;
- Daniel Lenahan, friend;
- Dan Rolder, friend;

- Donna Fuechtmann, aunt;

- Eric Dungy, friend;

- Eric Richter, friend;

- Kathryn Hinnenkamp, friend;

- Michael Shofner, friend; and,

- Molly McDonnough, friend.

Alexis Benson writes of Mr. Blegen's many qualities including his generosity and putting others before himself. She knows that he does have a positive support network that includes family and sober friends. She has noticed changes in Brandon since he has been in jail including accepting the errors he has made in his life and trying to turn his life in a more positive direction.

Mr. Blegen's mother, Barb Blegen, writes about his early years growing up and how though, now in hindsight, she knows he had a drug problem while he lived with them, things did not begin to get bad until he moved out of the family home. As she writes "for years off and on he would go to jail and want to stop using drugs and be sober. He would then move back into our house, start working for us again, seemed to do good until he entered back into the dark world of drugs again and would move out, once again, because he did not want to follow our rules." She notes that Mr. Blegen's chemical dependency has led him to make "awful, terrible choices on and off for over 20 years." Since his arrest for the instant offense, Ms. Blegen write that Brandon has told her that

17

he is committed to getting out of the drug lifestyle. Indeed, it appears that, as expressed to his mother, Mr. Blegen is in some ways glad that he was arrested because now "it is finally over!" As his mother writes, he is sorry, very remorseful and sad for what he has done and for what he has put his family through, once again, especially me, his mom. He wants to do his time and enroll in some type of trade and spiritual following within the facility he is sentenced to."

Mr. Blegen's father, Brad Blegen notes how Brandon becomes a different person when he is on drugs. As Brad Blegen writes:

> The drug side of Brandon is not very nice. He is arrogant, selfish and a danger to himself. However, the sober side is fun, loving, likes kids and dogs and is well liked by everybody.

Mr. Blegen's father knows that Brandon has the capability to do good, that he wants to make good choices and wants positive approval from his family.

Mr. Blegen has also submitted letters from people who he met at his darkest moments; fellow prisoners from his time in the Minnesota correctional system. They know firsthand the struggles Brandon has gone through as they lived that reality themselves. Daniel Rolfer knows that when Brandon is sober, he is honest, caring, and helpful. Eric Richter who is presently in the "Bootcamp" program from the Minnesota Department of Corrections, has known Brandon since they were teenagers. He confirms that Mr. Blegen seems to have made

drastic changes in how he was acting since his arrest and has expressed a

"high-level of remorse and regret for the things he has done."

Michael Shofner, who overcame his own struggles with alcohol and drug

abuse—struggles which landed him in federal prison—writes of how he sees

Brandon now going through the very same struggles he went through years

ago. As he writes "we have made almost all the exact same wrong decisions and

also been through the same experiences. I was able to come through it all and

find myself and get my life in order and find sobriety, happiness and stay out of

trouble." "I have no doubt that Brandon will come through this current

situation and find sobriety, success and truly find himself."

In considering the characteristics of the defendant, it is also important to

emphasize that while he does have a conviction for a crime of violence, and two

disorderly conduct convictions, he is not at his core a violent person. (PSI ¶57).

As to the second-degree assault conviction, while not rising to the level of a

legal defense of self-defense, there is evidence that the victim in that case, P.T.,

was an aggressor. This is certainly a mitigating factor.

Moreover, in considering what is a reasonable sentence in this case, while

Mr. Blegen did receive a prison sentence of 45 months for the second-degree

assault conviction, this prior crime of violence has effectively resulted in an

additional sentence; a further mandatory minimum term of 60 months

imprisonment in the instant case. (See PSI ¶46).

b.  The need for the sentence imposed.

Mr. Blegen understands and accepts the need for a lengthy sentence of imprisonment. Distributing over 45 kilograms of methamphetamine is without any doubt a very serious crime that warrants severe punishment.

A total sentence of no more than 180 months imprisonment, fifteen years, reflects the seriousness of this offense. It will protect the public from further crimes by this defendant as he will be in his late 40's or early 50's when he is released.

A sentence of no more than 180 months will also provide just punishment for the offense and adequately deter Mr. Blegen from future criminal conduct. The longest prison sentence Mr. Blegen has served in his life was a sentence of 45 months. A sentence of 180 months would be four times greater than this. Under the principles of incremental sentencing, a sentence of 180 months in the instant case is sufficient but not greater than necessary, to meet the needs of sentencing.

c.  The need to avoid unwarranted sentencing disparities.

Defendant believes that a sentence of 180 months, the statutory mandatory minimum, would not result in any unwarranted disparities between Mr. Blegen's case and other defendants with similar backgrounds who have committed similar offenses.

D.    *Other sentencing considerations.*

<u>A downward variance is warranted for "hard time."</u>

The district court may grant a downward variance from the otherwise applicable sentence under the advisory Sentencing Guidelines based on a defendant's spending a lengthy period in pretrial confinement under restrictive or difficult conditions; i.e. a "hard-time" variance. *United States v. Edmonds*, 920 F.3d 1212, 1215 (8th Cir. 2019). Mr. Blegen has been in custody in connection with the instant offense since December 21, 2019. (Dkt. 96, p. F.1). He has been detained at the Sherburne County Jail since December 23, 2019. Id.

As of sentencing, Mr. Blegen will likely have been detained at the Sherburne County Jail (SCJ) for approximately eight months. While the staff at the SCJ no doubt do their best to provide care and address the needs of the inmates, this facility is not designed for long-term incarceration. This is especially so for federal inmates who are housed there. Some of the hardships that Mr. Blegen has experienced over the year that he has been detained include the following.

Mr. Blegen has had extremely limited opportunities to spend his time constructively. The SCJ does not have much at all in the nature of classes or programming which federal detainees can use to not only better themselves but to simply fill up their day. While state offenders at the SCJ can undergo

21

drug treatment and take a variety of classes or programming, these opportunities are not available to federal detainees housed there. Thus, most everyday he has experienced over the last eight months has consisted of doing little if anything.

Second, the restrictions on Mr. Blegen's movements have been severe. For the last several months, inmates at the SCJ have been locked in their cells at least 20 hours per day. While defendant understands the necessity of these restrictions in light of the COVID-19 pandemic, the reality is that the conditions of his confinement have been severely restrictive and harsh. While we all are experiencing greater than normal restrictions, being confined to a small jail cell for 20 hours per day is something completely different.

Of the time he does have out, his ability to engage in constructive activities is extremely limited. A good deal of time is simply standing waiting for count or eating meals. The degree of restrictions certainly increases when the facility is on broader lockdown which occurs regularly for security reasons, weather and other administrative reasons.

Third, Mr. Blegen and other inmates at SCJ do not have any time outside other than when being transported to and from the facility. There are not even windows at the facility which allow inmates to see out and the skylights are covered with a white film.

All of these conditions amount to "hard time" which warrants a further downward variance.

## IV.    CONCLUSION

For the forgoing reasons, the defense requests that the Court impose a total sentence of no greater than 180 months imprisonment.  Such a sentence will be sufficient but not greater than necessary to comply with the purposes of sentencing under 18 U.S.C. §3553(a). Mr. Blegen also requests that the Court recommend to the Bureau of Prisons that the defendant be designated to a correctional facility in Minnesota or as near thereto as possible and that he be allowed to participate in the Residential Drug Abuse Program.

Respectfully submitted,

DATED: May 12, 2020.

GOETZ & ECKLAND P.A.

By: _____*s/Frederick J.*_____
     FREDERICK J. GOETZ
     Attorney Registration No. 185425
     Banks Building
     615 First Avenue N.E., Suite 425
     Minneapolis, MN 55413
     (612) 874-1552

     ATTORNEY FOR DEFENDANT